Good morning, Your Honors. May it please the Court, my name is Nelson Ebal and I represent Stacey Castillo. Your Honors, the District Court erred by ignoring the jury's answers to the special interrogatories given in connection with Counts 2 and 3. Instead, the District Court should have accepted the jury's answers and given them force and effect. Unless this is prepared to narrow a criminal defendant's constitutional right to a jury trial, it must reverse and acquit Castillo under Count 3 and vacate Castillo's conviction under Count 2 and remand for re-sentence without the finding of brandishing. Also, the District Court erred by overruling Castillo's double jeopardy objection to being sentenced under both Sections 924C and 924J. Instead, the Court should have only sentenced Castillo under only one of the two subsections. Unless this Court is prepared to overrule, ignore, or distinguish its holding in Batiste and Privet, this Court must vacate Castillo's conviction and sentence under Count 2 and remand for re-sentencing on the remaining counts. And if you're correct, what would the new sentence be? Your Honor. If you're correct on the double jeopardy. If correct on the double jeopardy, it would be a sentence based on the core offense under 924C. I'm sorry. There's a drug conviction you're not challenging that's 20 years, right? That's correct, Your Honor. That's correct, Your Honor. But what would change? What would change is that there would be a sentence without the aggravating factor of the brandishing. I don't understand legally. Factually, what difference would it make in the amount of time? If, say, for instance, in 10 or 20 years, there's a change to the way that a sentence under 924J is handled, and say, hypothetically speaking, it wasn't, if for some reason it was ruled an inappropriate sentence, I apologize, Your Honor. Can I have the question again? It's pretty simple. If you win on the double jeopardy and it's sent back for re-sentencing, what difference would it make in the sentence that would be imposed, time-wise? Time-wise, it would not make a difference, Your Honor. All right. Okay. Go ahead. Your Honors, back to the answers to special interrogatories. Again, the district court should not have ignored the answers to special interrogatories. Instead, the district court should have limited its sufficiency of the evidence review to the theories that were selected by the jury. In this case, for Defendant Castillo, the jury was given the option of convicting her in connection with a conspiracy, aiding and abetting, or personal liability. The jury selected personal liability. And because it selected that, the district court should have reviewed the sufficiency of the evidence just on the personal liability theory alone. To do otherwise was to not give Castillo her Sixth Amendment right to a jury trial. When the district court was looking at the sufficiency of the evidence, the district court should have considered the fact that there was no evidence that Castillo even touched a 9mm gun. It's undisputed that a 9mm gun is the one that was used to kill Shawn Lamb. Admittedly, if the jury had selected conspiracy or aiding and abetting as the basis for the 924J, charge Castillo would be, there would have been sufficient evidence. But in this case, there just simply wasn't any evidence at all. Did you object to the judge giving the personal liability answer on the special form since everyone now seems to concede there's no evidence to support a finding of direct liability for the shooting? There is no objection by the trial counsel. What was the whole point of the special verdict form? Those are rare in criminal cases. Yes, Your Honor. Your Honor, I was appointed to represent Castillo on appeal. But from reviewing the record, it appears that the defendants were concerned about there being unanimity when the jury returned its verdicts. And the government, and this is very significant, the government had no objection whatsoever. But normally with unanimity, you just give an instruction that says there's different theories. We remind you, you have to be unanimous as to a particular theory. So it's just unusual to have these special questions and here we are trying to sort it out. Weren't they requested by defense counsel? Yes, Your Honor. They were requested by defense counsel. Even though it might be unusual, it's not unprecedented. And certainly there have been agreed upon special interrogatories in other criminal cases. And they can be included for many different reasons. One of the reasons might be to simply avoid the possibility that a defendant is convicted on a theory for which there's insufficient evidence. As Justice Blackmun mentioned in the Griffin case in his concurring opinion. All right. Thank you, sir. Your time's up. You'll all have decided to divide up all this time. So no one really is going to get enough time. But it's your choice. So, Mr. Calhoun, you're next. Thank you, Your Honor. My name is Alex Calhoun. I represent Mr. Rudolfo Paredes in this case. Our issues are largely the same as Mr. Ebas for Castillo. I may be able to try to answer certain questions with respect to those issues. What I would like to try to do, I guess, the Court is aware of the law. The Court is aware of the general rule from Griffin in that this case represents a distinction from that. There are several cases throughout the circuits which demonstrate how when your court is reviewing the sufficiency of a special verdict, it's measured by the special verdict, not from some general verdict. I found extra cases in preparing for oral argument. I can submit those to the Court in a post-submission briefing as opposed to taking up time right now. But I can tell the Court that the Fifth, the Second, the First, the Sixth, Eleventh, and Eighth Circuit have all addressed sufficiency of the evidence arguments with respect to special verdicts. You said we have? Yeah. Yes, sir. U.S. v. Harris, that is 420, Fed 3rd, 467, carjacking case, actually out of Midland, Odessa, the same district here, in which the Court considers abound by the jury's special verdict answers with respect to the lack of intent to kill, which undermined the general verdict of carjacking. So Harris is a very good place to start, but the Fifth Circuit is not alone in its recognition that the special verdict forms are what limits the review of the evidence, not some hypothetical general verdict, but to the actual verdict that the jurors returned. If I may briefly address the issues that were raised by the government in its brief in its 420 and its 28J letter. The government relied upon a case called U.S. v. Masaccio, a Supreme Court case. What I would argue to the Court is that that case is not even applicable on the facts of the law to a case like this. Under Masaccio, the district court included an extra element of the offense that the government was forced to prove, and then the defendant challenged the sufficient evidence based upon this heightened burden of proof. What the Supreme Court held basically was that in looking at the sufficiency of the evidence, you look at the actual elements of the charge, not any added elements that are added by the district court. So I think of that sort of as a windfall case. The defendant cannot profit by any windfall of an erroneous jury instruction that the district court might provide. There's no erroneous jury instruction here. It's a question about the jury's answers. Absolutely correct, Your Honor. This wasn't an erroneous jury instruction, which I think addresses a lot of the issues that the district court tried to distinguish it. It wasn't superfluous because it was in the court's discretion. It was an error, so it couldn't have been an invited error. It was an erroneous jury instruction. The jurors were asked to choose one of three mutually exclusive theories of recovery. One was personal liability. One was Pinkerton. One was aiding and abetting. The jurors chose personal liability. By doing so, they effectively acquitted Mr. Paredes of aiding and abetting and Pinkerton. The evidence, however, is not sufficient to prove personal liability. Everyone, including the government, concedes that Mr. Noe Galant was the one who actually fired the shots. So our whole argument focuses back upon the fact that because of the juror's verdict, the evidence does not support the actual verdict of guilt against Mr. Paredes. The government also raised the Fourth Circuit case called U.S. v. Braun. That's a bit more subtle, but what I can advise the Court is it also is unlike this case here in that the evidence in Braun did support the special verdict. And what Braun was was that it was a murder and it was the use of a firearm. The jurors chose one of the theories of recovery that the defendant caused the firearm to be discharged. The defendant argued that that doesn't show use, but the Court of Appeals said, well, the evidence does show that the evidence was that by causing it to be discharged, that actually was a use falling under the law. Again, that's different from the case right here because the evidence does not show the theory of recovery, which is personal liability. So even Braun does not necessarily address the question of distinction between special verdict form and general verdict. But again, it relies upon a kind of a legal slight of hand to justify its ultimate conclusion. So Braun does not save the government's case in this situation because it is not applicable to the case at hand. Your Honor, that's basically my presentation. Are there any questions I can answer about the case? All right. Thank you. Thank you, ma'am. Mr. Staudter. Good morning. You had asked what was the reason for the special interrogatories. Of course, Mr. Ebal wasn't there. And the way this usually happens, as you well know, is the judge's clerk, the government, and the counsel for defense get together. What do you think ought to be in the charge? We made it very clear that we're going to object to Pinkerton liability in our charge, which we did. But in order to isolate that and give it a chance of review, we decided, the defense and the government agreed the best way to do it is to do it the way we submitted it. Because, I guess, I talked about the Howard case, that Enron case, where the guy, the defendant was convicted on a general verdict, and one of the theories of the government was dishonest services. And I guess the Supreme Court said, no, you can't use that. Comes back, and I guess this Court says, well, we've got to send it back because it was a general verdict, one based on an invalid theory, so we need to send it back and find out what it was. So that's one of the reasons we wanted to avoid retrial of this matter if Pinkerton, at some point in time, it's decided does not apply to first-degree murder. Anyway, that's the reason. And the government was fully aware of it and fully agreed with us in that approach. And again, of course, it wasn't in error at all, and it certainly wasn't invited, the doctrine's just not applicable. Now, what we're arguing here on the count three, the murder, is that they've got to have some evidence in Mr. Gonzales, under 924J, that Mr. Gonzales was a person in the course of a violation of that conspiracy and carrying a gun, causes the death of a person through the use of a firearm. Plain language says Mr. Gonzales has to personally use it. That's one of the theories. The other theory was Pinkerton, the other theory was Aiden Abet. Clearly, the jury answered personally, personal liability, but clearly not rational based on the evidence, because there's absolutely no evidence that he personally did it. He wasn't even at the scene. I thought he brought the Mac-10. Well, he brought a Mac-10, Tech-9, whatever it was, at a party. Not a party, I mean a get-together at an apartment long before the killing. He was not at the scene of the shooting where Mr. Lamb was brutally murdered. He was not there. I'm sorry? His gun there? We don't know. It was never matched to that any particular gun or proof that it was his gun. We know he brought something to that get-together prior, a good while before the actual murder. We don't know if that was a gun or not, for sure. Was it the same kind of gun that shot? I'm sorry? Was it the same kind of gun that shot the person? Maybe. It was described in numerous ways. Is it a Tech-9, Tech-10, Mac-10? Some of the witnesses... Usually when they do an autopsy, they'll say what kind of a gun... Well, it was a 9mm. It was a 9mm. Yes, it was a 9mm. He was killed by a 9mm. That's correct. Of course, they also have Mac-10s that are .45. So, I don't know. It was a 9mm. We know that. A 9mm is one kind of a Mac-10. And again, I've got a question that I think we might consider. If these items had been submitted separately, is Mr... It would be phrased a lot more artfully, I'm sure. Did Mr. Gonzales personally use a firearm to kill Mr. Lamb? Next question. Totally different question. Did Mr. Gonzales aid in the killing of Mr. Lamb? Next question. Did Mr. Gonzales engage in a conspiracy that resulted in the death of Mr. Lamb on the conspiratorial liability? I don't believe there's any question that if they would have answered that question, answered the question separately, that he personally killed him, we would consider that, obviously, insufficient evidence. And again, the general verdict is limited by the theory that the jury found. The judge supplying his own rationale to go behind the jury verdict we believe, again, as Mr. Ebaugh said, it violates his right to a jury trial. The jury makes that decision, right or wrong. They made the decision. It was not based upon the evidence. And that should be the only evidence to be considered. Should Pinkerton apply in a murder? Our argument is no. You've got a specific intent and we're... It's in our brief about Cherry. We think that's the best approach, although I think the circuit's outnumbered Cherry. But we believe Pinkerton should not be applicable because as found in this charge, it was premeditation, first-degree murder. And Pinkerton, for liability, all it requires is a reasonable foreseeability, you know, a necessary or natural consequence of the unlawful agreement. Reasonable foreseeability and premeditation are not nearly the same. Pinkerton should not apply in a murder case like this when you have this increased specific intent requirement. All right, sir. You have your red light. You have your argument. Thank you. Mr. Leach. Good morning, and may it please the Court. My name is Jason Leach and I stand before the Court today to argue on behalf of Raymond Oldgeen. Mr. Oldgeen is in a somewhat different posture than his three co-defendants. He was the one they did say was conspirator liability. What's the factual distinction with him? I guess he was the driver. Was he not armed? Is that the factual difference? There was no evidence he was ever armed and he was the driver. Those are correct statements. I need to return to your question first, Your Honor, about what difference would it make. I did assert that Mr. Oldgeen's count two convictions should be jeopardy barred. Mr. Oldgeen received a 20-year sentence on count one, a life sentence on count two, each to run concurrent. I'm sorry, count three is the life sentence, to run concurrent to count one. Count two was stacked on top to run consecutive by Judge Janell. Two counts, one and three. So it would make a difference in the sense that Mr. Oldgeen would not serve a 20-year sentence concurrent with a life sentence and then have a seven-year sentence remaining. So that is why I raised the 924C versus 924J issue for Mr. Oldgeen. With respect to the Pinkerton argument, the government sought a pretrial ruling that Pinkerton applied. We objected as defense counsel and said that that would be an inappropriate time to rule. Judge Janell ultimately overruled our objections at the conclusion of trial. The basis of our objection was the Cherry case, which is a Tenth Circuit case, which stands in opposition to the Alvarez case that has been cited by the government. In Cherry, they stated, we have never extended the doctrine to hold co-conspirators liable for first-degree murder that was not the original object of the conspiracy. What that means is, generally speaking, there's two types of Pinkerton liabilities that are set forth in Alvarez. One is the substantive crime is also the goal of the conspiracy. The other is the substantive crime differs from the nature of the conspiracy, but somehow facilitates the implementation of its goals. So we have two different types of Pinkerton arguments. Cherry went on to say, although intimidation and violence may or may not be foreseeable results of a particular drug conspiracy, first-degree murder liability incorporates a specific intent requirement, far more stringent than mere foreseeability. Therefore, we objected to the imposition of that charge, and then once that objection was overruled, then we got the special issues. And, of course, Mr. Holguin was found as a co-conspirator. You're relying on Cherry, but the Tenth Circuit found that Pinkerton did extend to murder in the Rosales case. It seems to me the facts are even stronger here. I think there was some evidence that someone said, let's go get him, and then they all jump in a car with a bunch of guns. Wasn't that even stronger than Rosales? I would respectfully contend that the evidence in this case is less strong than that. And what Cherry really speaks to is, do substantive crimes occurring as a result of unintended consequences, is that encompassed by Pinkerton? And we would suggest that it is not, and we would suggest that is exactly what happened in this case. The killing of Sean Lamb. So what were they going to do when they jumped in the car with the guns? To locate narcotics. So they're seeking to recover narcotics that were either stolen by Sean Lamb, Stephen Sines, or another cohabitant with Ms. Gonzalez. They go, and the first place they go, following Sean Lamb's abduction, is to this motel to locate Stephen Sines to recover the drugs. That's what the testimony is that Ms. Hernandez gave. When they don't locate the drugs, he says the drugs are located in another location. I can take you there. They then leave that location, Mr. Olguin is a driver of a vehicle, and they end up in, I believe, a relatively close location called Country Club. It's an old Country Club neighborhood in Odessa. At which time, Mr. Noe Galan executes Sean Lamb. At that time, some of the people involved and charged and went to trial were not even present. Mr. Olguin was in the front seat of the vehicle and ran. I believe he testified, they played some excerpts of his testimony, that it was totally unexpected and to him. And my point would be that if the purpose of the conspiracy is to recover the drugs, the execution of the only person that knows their location does not seem like it would be an act taken in further into the conspiracy. It does not seem like it would be reasonably foreseeable to those trying to recover the drugs that it would be beneficial to execute Mr. Lamb. Thank you. Mr. Stelmach. Thank you, Your Honors. May it please the Court. The sufficiency issue as to count, the sufficiency issue as to count three presents the question of whether, after the jury has returned a general verdict, the Jackson v. Virginia sufficiency standard should be limited by the answer to a special interrogatory. And here the jury checked the personal liability box when it was never alleged and there was no evidence that any of the defendants personally shot Sean Lamb. Your argument depends on basically saying we can disregard the special question. Well, let me make this point. This is what the, it wasn't a special interrogatory, who do you think shot Sean Lamb? And then it would be completely absurd. The special interrogatory says three different ways of committing the crime. Quote, the first is that the defendant is personally liable for personally using or carrying a firearm during interrelation to the defendant's alleged commission of the crime charged in count one that resulted in the death of Sean Lamb. Well, the jury making this finding, it was in a sense factually correct. Gonzales and Paredes personally carried the MAC-10 during interrelation to the commission of the drug conspiracy. Gonzales brought it to the meeting and that, the meeting was on the day of the murder right before they went to interrogate and assault Sean Lamb. Paredes personally carried the weapon in the alley and he personally carried it at the motel where he delivered it to Golan. So the jury's answer of that question, you could see why they did it. It wasn't completely crazy. And the court was correct that it shouldn't have included jury question three. Special interrogatories are not used unless there's a genuine risk of confusion or uncertainty about the acts that a defendant committed. This was a three and a half day trial, three counts, it wasn't complex. There was little confusion or uncertainty as to the roles of each defendant and there was no confusion about who used the firearm to shoot Sean Lamb. This was not needed to avoid confusion. It's a question of what added confusion to the case. And I think the guidance of the Supreme Court from Eusakio is very useful as to the parameters of what a sufficiency review is. In that case, the trial court added instructions, an additional element, and appellant made the argument that sufficiency should be measured by the additional instructions. And the Supreme Court went back to first principles that said, essentially, a sufficiency review addresses whether the government's case was strong enough to go to the jury at all or was so lacking that it shouldn't have even been submitted. This is the limited inquiry of the reviewing court. And I also have the quote that the reviewing court's determination on sufficiency does not rest on how the jury was instructed. And this was a failure to object, or they didn't, the failure to object by the government didn't impact that. Excuse me, I'm sorry. But in a sufficiency review, you do have to look at what the jury answered. That's different than how they were instructed. Why under Eusakio wasn't it insufficient evidence to give the personal liability instruction that the jury ended up finding? Because you're now conceding there was no personal involvement in the murder. There was no personal involvement, I agree. But the focus in Eusakio and in a sufficiency is what any rational jury could do. It's not what a particular jury does after it returns a general verdict. The focus is a purely Jackson focus as to whether the elements could have been proven beyond a reasonable doubt. Brand, I think, is also supportive. The jury returned a general verdict of guilty. And there were special interrogatories. And the special interrogatories asked, did Brand aid in another to use, to carry, or to discharge? And the jury picked discharge. And the argument was the failure to pick use, the statutory element, amounted to an acquittal. And it's true, yes, it's true, that as an alternative, supportive reason, the Court said that use embraces discharge. But prior to that, the holding is the jury's general verdict alone is sufficient to uphold Brand's 924J conviction. It was the supremacy of the general verdict that was important there. And I agree that this Court's Harris decision is instructive in this case. And Harris was convicted of carjacking. And that required an intent to kill or harm the victim. But the jury's special finding was voluntary manslaughter, which negated that insufficient mental state for the carjacking conviction. But the Court didn't say, as in Frampton, this is the end of our inquiry. The Court looked to see if there was any evidence that supported the intent to kill. And that's what I'm arguing here to make a sufficiency inquiry under the Jackson standard, notwithstanding the special interrogatory. And, again, the essence of the argument on this issue is that, this was another quote, from Musacchio, all appellants are entitled to is for this Court to make a legal determination as to whether the case was strong enough to reach the jury at all. And here it was strong enough to reach the jury. A rational jury could have found the elements beyond a reasonable doubt. It sounded as if the other three appellants were saying that if Pinkerton was applicable, then there would be guilt. But even if you would say that the special verdict trumped the general verdict, you would still need to look, as Mr. Olguin's counsel went, as to whether there was evidence for Pinkerton liability. And here the evidence showed a conspiracy to possess with intent to distribute the methamphetamine. It showed Lam's kidnapping, violent interrogation, killing. They were both in furtherance and reasonably foreseeable. It's in furtherance because they're joining as enforcers. You further the conspiracy by finding the drugs. You further the conspiracy by discouraging others from stealing. You further the conspiracy by killing an informer. Rubin was supplied as Castillo, admitted by the La Lina cartel. And it's foreseeable that armed cartel people would react violently to their drugs being stolen. Castillo had a plan to trap Lam in the alley, and they all drove to the alley to box Lam in. I would like to clarify a little bit about Paredes brandishing the rifle. There's no ambiguity about the rifle. There's only one camouflage rifle with a black suppressor. Gonzales brought that to the meeting before the kidnapping occurred. When Gonzales sold the rifle, he admitted to Benson, and there's testimony of this fact, that this was the weapon that was used to kill Sean Lam. So how do we know that Mr. Paredes was the person branching the weapon in the alley? Well, the testimony is clear. Rubin's drugs are being stolen. So he and Liz and others immediately rush and start beating up Sean Lam. The witnesses all testified, two in particular, that a man in a red shirt was carrying the AK weapon, the MAC-10 weapon, the TEC-9 weapon, however you want to describe it. The video shows that only Paredes and Rubin were wearing red shirts. And in a key feature, the witness testified that the person in the alley brandishing the weapon in the red shirt was not one of the people that was beating up Sean Lam. So it had to be Paredes. Lam was killed with malice, ill will. They were angry. It was after brutal assaults. You can use the manner of death to show malice. Premeditation, shown by carrying firearms to the kidnapping. Lam's moved twice, giving time to reflect a shot while helpless and confined, shot in execution style. Shot 10 times. I think that there was overwhelming evidence that it was foreseeable that Lam would be killed by Gallin based on the armed kidnapping and armed assaults and the theft of the cartel's drugs. Oh, as to the double jeopardy issue. Let's go back to brandishing. Do you concede that there's no evidence that Mr. Castillo brandished a firearm? Um, yeah, Ms. Castillo, yes, I would concede that there is no evidence that Ms. Castillo brandished the firearm. She brought her revolver to the meeting. She held it in her hand as she came to the meeting. It was testified that she kept it in her purse. But she's not brandishing, well, in a sense, to be intimidating her fellow co-conspirators. I don't think you could say that. So, no. Hers would just be, hers would go to the five-year for just carrying a firearm during and in relation to a drug trafficking crime. On the double jeopardy argument, what's your position? Well, I'm not an arguer here on the double jeopardy argument. The department's position that they couldn't be published or punished for both 924C and 924J for use of the same firearm. I don't think it's necessarily straightforward. You get a court like Wilson who says, well, we read the statute. Let me backtrack a second. It doesn't matter if it fails the blockburger test if they find an intent by Congress to impose cumulative punishments. And so, Wilson says, well, it doesn't look like there's an intent to impose cumulative punishments. And then you have a court like Julian, and Julian is a little bit ahead of the curve because some of the past cases were that 924C and 924J were not necessarily separate offenses. They're on the allying bandwagon in the Julian court and says that they are separate offenses. And they find the intent of Congress to impose consecutive sentences in the fact that the language in 924C of any other offense shall be imposed consecutively. So, this court's going to have to look at the structure of the statutes and the effect of the cumulative sentencing mandate to see what Congress's intent was there. I hate to give back so much time, but, Your Honor, I have no more questions. Thank you. Thank you. All right. Defense Counsel, I'll have some rebuttal time. Mr. Ebaugh. Your Honors, the government apparently relies heavily on Musacchio. That concerns a very different set of facts than we have in this case. In Musacchio, you had an added element that wasn't supposed to be there. We don't have that here in this case. So, Musacchio doesn't control this situation. Also, the government relies heavily on Bran. Likewise, that case doesn't apply to, it's not persuasive in this case. It doesn't apply to the facts we have here. In Bran, you had special interrogatories which asked the jury to explain whether they based their conviction on use, carry, or caused a firearm to be discharged. In that case, the jury selected caused a firearm to be discharged. The appellate court concluded that caused a firearm to be discharged is effectively the same as using a firearm. And that's what they based their sufficiency review on. And they found that there was sufficient evidence of use. Here, the jury only selected personal liability. And there is no evidence at all that Castillo was personally liable under 924J. As I explained in the opening, sufficiency of the evidence is limited to that theory alone. Unless the panel has any further questions, I will go ahead and be seated. All right. Thanks, sir. Mr. Stroder. I just wanted to reply shortly on a couple of things. I want to make it clear that I believe  is clear that carrying is not sufficient to sustain a murder conviction under 924J. It's got to be use. Frankly, in the charge, it says carry when they're talking to the jury. But as Mr. Castillo says, it's what sufficiency should be judged by the law, the elements of the crime. But I want to make it clear that it's carry does not cut it on 924J. It's got to be use. You've got to kill somebody. Use the firearm to kill somebody. The person convicted has to personally use it if he's using personal liability. Under brand, I believe it's just as dangerous as Mr. Ebout told us. And important to say here is that the court, in all due respect to Fourth Circuit, when they said the general verdict was enough, they really didn't talk about it. They just, boom, it's enough. And then went on to explain a further reason that backs it up. And I think that's what distinguishes here because it had discharge with, you know, in my mind, I would have to agree with them, it would encompass use if you discharged it. So their decision was certainly not unreasonable the way they put it. But I think that is not appropriate, is not comparable with the case we have here. Now, a question I got for the government, if the general verdict is enough and you can just ignore all the interrogatories, what is the purpose of putting interrogatories in there? If you can just ignore it if it's inconvenient, could the judge do that if he just disagrees with the jury's verdict? Say, well, I don't agree with that, so we're going to ignore it and just go with your general verdict? I don't think so. That's a jury trial, that's where you're entitled to. So I think they're stuck with it. I don't think that argument is any good at all. And again, the government talks about generally, some general propositions of all things that can happen in a drug deal and possible reasons. Kind of light on that evidence. All the evidence was, and all that the government said was the goal of this operation was to get those drugs back and distribute them. Not to kill anybody. In fact, a lot of surprise happened after it was done. You did what? This was not reasonable foreseeable. And as Mr. Thank you, sir. Would you start saying again, then you've already said it. Sorry? When you preface your sentence with again, that means you've already said it, so we heard it the first time. Oh, okay. Thank you. The government spoke to the issue of premeditation. I think what Mr. Stroder was going to is what's referenced in my brief about if this court wants to know the nature of the premeditation. Premeditation was defined as a killing is premeditated when it's a result of planning or deliberation. Both Brian Hernandez and Liz Hernandez testified at trial regarding circumstances of the killing of John Lamb. The government on direct examination asked Liz Hernandez, based on what you heard, was she surprised, meaning Stacy Castillo, or did you believe she was surprised as to the shooting happening in the country club area, or that it happened at all? Answer, I believe that it happened at all. The same would be said of Brian Hernandez's testimony. On cross and I think even on redirect, he conceded he would have never participated had he foreseen, been told, had it been implied in any manner that this result was the purpose of luring John Lamb to a meeting     we talk about specific intent and Pinkerton is in that premeditation is the intention of the premeditation is the intention of the premeditation of the shooter. We are transferring that intent to Mr. O'Geene. Mr. O'Geene gets punished for premeditation by someone else unless it can be shown that he is responsible as a co-conspirator and I think that stretches the Pinkerton doctrine farther even than Alvarez or Cherry or those courts would permit. Thank you. All right. Thank you, sir. Defense counsel, a court appointed and we certainly appreciate your hard work and your good service.